This morning is 13-1678, Japanese Foundation v. Lee. Mr. Jedd, I'll give everybody a chance to settle down. Ready? Okay. Go ahead. Good morning, Your Honors. Adam Jedd for the government. May it please the Court. No statute or regulation requires the PTO to nullify a terminal disclaimer. In this case, the PTO explained the facts, explained its long-standing policy that it will not engage in case-by-case determinations of whether there has been reliance or exactly what happened. Can I interrupt and just get to what's concerning me? Plainly, the PTO has nullified disclaimers, Carnegie Mellon. Now, you don't say that the other side cannot complain about the PTO's failure to distinguish Carnegie Mellon because they didn't bring Carnegie Mellon to the hearing. And at this point, I guess I'm curious, assume that the district court went overboard in saying, unless the PTO concludes that there actually was authorization, they have to enter the thing. What I'm concerned about is this. You agree that the agency had to meet ordinary APA reasonableness standards for the exercise of its discretion. And I'm having trouble finding in the PTO's explanation, not your brief's explanation, the PTO's explanation, a justification for denying the withdrawal of disclaimer here when it has granted that elsewhere. Well, so I think there are two answers to your question, Your Honor. First of all, obviously what happened in not the Carnegie Mellon case itself, obviously, but the sort of underlying PTO action that was referenced in Carnegie Mellon is extraordinarily rare. Indeed, actually, the action in Carnegie Mellon was the only one that we've heard of. So it might well be distinguished that the PTO hasn't distinguished it. Sure. All that I mean to just sort of flag for Your Honor is that subsequent cases of, for example, this court, including Vetra Fitness, might actually call into question whether the PTO would proceed in the same way as it did back when it took the action at issuing Carnegie Mellon. But there are differences. And Your Honor is right that, obviously, the Carnegie Mellon case and spell it out. But what I can tell you is I think it's on 996, the footnote of the joint appendix. The PTO references the fact that it will allow the sort of one exception of withdrawing a recorded terminal disclaimer. And it cites the relevant provision in the MPP. I think it's in Section 1493. Which does not cover the Carnegie Mellon case. That's not a transposition of digits case. It was an actual correct patent number in which the disclaimer was entered, but incorrectly. Our understanding is that it was a transposition of digits. I mean, this may just be a little bit semantic. It's not like the numbers four and seven just got inverted. Obviously, a whole number was put in place instead of a different number. That's what I don't regard as a transposition. Well, I apologize, Your Honor. The PTO in the MPEP provision, which is cited in the particular instance where there was a double obvious misrejection and where there was, the language it may use is transposition of digits, but I understand that to mean switching numbers. It says that there the mistake is likely obvious from the record. That on the face of it, they'll be able to know what mistake happened. And so in the decision here, where the PTO says, look, we don't want to have to engage in ad hoc determinations about whether there was reliant and about whether the attorney was actually authorized, was directed by the... Can I change that? Where does the PTO ever talk about attorney authorization? It talks about how it won't engage in an inquiry into whether something was intentional, but that's plainly, I think, plainly not consistent with Carnegie Mellon. It was plainly an intentional disclaimer, but filed in the wrong, naming the wrong patent. On 8999, where the PTO says that the inquiry ended when this was filed in the office by the attorney of record and accompanied by the appropriate fee and says that it doesn't want to engage in the exercise of second guessing... Second guessing about intent. It did that in Carnegie Mellon. Well, Your Honor, my understanding is that in Carnegie Mellon, it essentially just adopted an exception where it said, look, here we don't have to look into exactly what happened between attorney and client. I mean, what it says in the relevant MPEP provision is they say on the face of the record, it's obvious what happened there. Now, obviously, reasonable minds may be able to differ about sort of exactly how the competing policy considerations come out in that circumstance versus in this circumstance, but it's certainly not irrational for the PTO to draw that distinction. Well, I'm not... I don't think I have remotely suggested that it's irrational, but what has to happen is that the agency has to exercise its reason and make the point. I mean, I think there are a lot of standard APA cases, Chickarella Drive in the D.C. Circuit, others too, that says the lawyers can't come into court and say this is okay and different from that when the agency hasn't said here's why it's different. Well, I think there are two responses to that, Your Honor. First is, as far as I understand it, under the APA, the agency needs to explain its decision, but obviously doesn't need to sort of tick through every other decision that might be related and explain why it is that it's different. To the extent that the agency does need to give an explanation of why it's different, I understand that reference to the MPEP provision, which points to, I think not actually Carnegie Mellon itself, but points to that sort of circumstance, and says that, quote, the inadvertency would be, or it's approximately a quote, that the agency would understand that to be saying that that one exception to this general rule, the agency justifies because it believes there the inadvertency would be apparent from the face of the record. Again, as I explained, I think that in light of some of this Court's subsequent cases, like Vectra Fitness and Yamakaze, there's actually a question of how what happened in the underlying PTO withdrawal in Carnegie Mellon would actually turn out today. But the extent that the PTO in the MPEP has said, we're going to treat that situation differently and we're going to do that because the inadvertency is apparent from the face of the record, they at least sort of flagged in a footnote in their decision here the fact that they do treat that situation differently and they cited the relevant MPEP provision. But was Carnegie Mellon argued to the PTO? The Carnegie Mellon decision itself is actually a Third Circuit decision that deals with a malpractice claim underlying the Carnegie Mellon decision. I understand that, but was the Carnegie Mellon point argued to the PTO here? I'm not sure, Your Honor. I don't have the answer to that question. My recollection is that it was not, at least in the joint appendix materials that reproduce the filings that the Foundation made here. I don't see any mention of it. But I also did not see mention in your brief of an argument that says that is enough to excuse an otherwise missing explanation of a distinction of a circumstance in which the PTO actually did withdraw a disclaimer after, for all we know, people in the public started practicing the patent or making investments to do it. Well, Your Honor, the reason that we didn't make that argument in the brief sort of terms on the argument that the plaintiffs have made about Carnegie Mellon, and I apologize if I've been unclear about this, so let me break this down. There are two different arguments that in theory could be made about Carnegie Mellon. The argument that I understand Your Honor is that it was not made in the brief. And that argument goes something like, why didn't the PTO in its decision here clearly spell out why it is that this is different than Carnegie Mellon? And to that, as I've explained, I don't think it's necessary that the agency sort of checks through every alternate case. And to the extent that it is, I actually do think the reference in that footnote to that factual scenario, the MPP addresses that. But that argument that Your Honor is advancing, that the agency didn't kind of clearly point to the underlying decision in the Carnegie Mellon case and maybe as clearly as they could have explained why it is that this is different than that, that I don't understand to be an argument that the plaintiffs have made. Let me state maybe the form of the argument that uses Carnegie Mellon as an example. Most of the agency's decision says, we can't do it, we're powerless, and you've quite sensibly walked away from that argument. You say, they may have authority, we assume they have authority, they simply have to exercise it reasonably. Correct, and then they give the alternate grounds. So I look at the two and a half pages or so, 998 to 1,000, in which the agency says, here's our reason. Now, the first thing it says, and you say, is the public can rely, have to be able to rely. And the first thing I say to myself is, we don't know if they mean that completely across the board, because Carnegie Mellon, exactly the same situation. And I think they say, that's not a sufficient justification. And the second thing you say is why the agency can't be expected to inquire into attorney authority in every single filing. That's obviously a red herring. The question is whether the agency is adopting a policy that says, in the tiny, tiny, tiny percentage of cases in which somebody makes a filing that says, oops, my client didn't authorize me to do this, the agency wants to say, we will not look at that. I don't see the agency having said that. Which I think it could reasonably say, but it hasn't done so. Well, respectfully, I understand those two points to be two sides of the same coin. I think when the agency says it doesn't want to, slash, it can't engage in these kinds of case-by-case determinations of exactly what went on between attorney and client, and the agency does say, I think this is on our N998, that they don't want to have to examine the reasons for filing a terminal disclaimer, I understand that to mean, look, if the agency, when sort of faced with this kind of accusation, that even though you had a disclaimer that under the regulations was properly filed, that nonetheless, maybe there was some kind of a disagreement between attorney and client, if the agency were forced to then decide, you know, figure out, well, what actually happened here, that then on the front end, the agency would be in kind of a tough position, because even though they promulgated these regulations that say, in the language in the agency decision here, that the inquiry ends at the door, that once it's been filed by the attorney of record, and to be clear, under the applicable regulations, the attorney of record is essentially someone who has a power of attorney over the patent, they could have picked any attorney, they could have picked only the patentee, instead, in the regulations, they picked attorney of record, that then they would be in a difficult situation of maybe being required to put things into the patent file that someone might later challenge, and I think that when the agency then talks about both reliance and the fact that it doesn't want to have to make ad hoc determinations of reliance, and that it doesn't want to have to make case-by-case determinations about what happened between attorney and client, that's what the agency is saying. Now, again... And haven't we just, I mean, done, I mean, almost a perfect example of what courts mean when they say lawyers post-hoc rationalizations for agency decisions, where all the reasoning is not, in fact, adopted by the agency, it depends on empirical assessments and practicality judgments, which you can easily imagine an agency making, but none of this is in this opinion. Well, Your Honor, I mean, I understand that all I'm doing is simply reciting what's in the opinion. No, that's not what I said. Obviously, it's not what I said. What you're doing is vastly elaborating on what you find in the opinion. I apologize for that, Your Honor. Obviously, as the court is aware, the standard is not whether the agency spelled out something precisely, but rather, in the Supreme Court's language, whether the path may reasonably be discerned. And when the agency makes the policy point that patents generally should not be given back to individuals after they have been disclaimed, when it makes, and these all are absolutely in the opinion, when it says that it does not want to engage in ad hoc discriminations of whether there was reliance, when it says that it has a general policy, which comes up in patent prosecution estoppel, and obviously a number of areas that this court is aware, that the agency will treat a filing by an attorney as a filing by the client, and this is still in the decision on 999, when the agency says that it will not engage in these kinds of case-by-case determinations about exactly what's happened. I understand the agency to be pointing... That's the key point, right? So everything else fails to distinguish Carnegie Mellon, and the point that general reliance on attorney's representation does not conclude, does not answer the question, does general mean absolute? It's the little reason for why there will be no exceptions, and what you're suggesting is that in the reference on 999, the office is not the proper forum for resolving the issue whether the disclaimer was filed per the intentions of the patentee. That's correct. That's the critical thing that is backed by this elaboration of how it would not be practical. You know, practicality doesn't matter. We understand it. I mean, I'm happy to just stick with the term, this is not the public forum. When the office, which would have to make this determination, says this is not the proper forum, and they do cite applicable cases, I think they cite Link, pointing to that background policy, we understand that to be a policy weighing being made by the office. Now, I understand Your Honor's point. I understand that... And a policy that goes not just to general, but absolute. Never, under any circumstances, we get one of these petitions every five years, and it conclusively shows that there was lack of authorization. Nevertheless, we are not going to withdraw the disclaimer. Is that what the PTO... It seems to me you're saying that's what the PTO has said. Your Honor, obviously I can't bind the PTO to exactly what decision it would make in the future. As the Supreme Court has said, in cases like NLRB v. Bell, obviously an agency in an adjudication can sort of, through a common law process, slowly flesh out its policy. So, in this scenario, obviously the agency has applied its longstanding policy. Your Honor indicates that there is the one exception, the one instance that came up in Carnegie Mellon, because I don't think the plaintiffs have complained about the fact that the agency didn't give a precise explanation as to Carnegie Mellon and its decision. That's what I'm missing in their brief. Did they argue that the agency should be... Decisions should be set aside because there was a failure to explain the difference between this and Carnegie Mellon? I understand the plaintiffs to be making the argument that this case is functionally the same as Carnegie Mellon, and so therefore... They didn't argue that, but where do they argue that the agency's failure to explain the difference between...  Wait, wait, wait. I apologize, sir. Between this case and Carnegie Mellon requires that the agency decision be set aside. I don't believe that the plaintiffs have made that argument, and so that's why, in response to Judge Toronto's question, we did not identify the possibility of waiver because the plaintiffs have not yet made that. So, this is my first opportunity to be able to say to the court, that argument, we don't believe, was raised by the plaintiffs either before the agency... I mean, obviously, there would be no explanation given yet before the agency, but in particular, in its brief, to the extent that the court believes that the agency needs to have addressed the differences between this and Carnegie Mellon, I do just want to flag that, one, I think ordinarily an agency does not have to sort of check through every other decision, which may be a little bit different and explain the differences, and two, to the extent that it does, the agency did, in a footnote, identify the kind of factual scenario that has come up in Carnegie Mellon and points the relevant MPEP provision, which says that in that factual scenario, the inadvertency is apparent on the face of the record. And we think that that is, even if it were necessary for the agency to distinguish between this and the underlying decision that was made, I think, in the 90s in Carnegie Mellon, that in the Supreme Court's language, that path may reasonably be discerned. Unless the court has any other questions, I will reserve my remaining time for rebuttal. Thank you. You've exceeded your time, but we'll restore two minutes of rebuttal. Thank you. May it please the Court. Michael J. Lockerbie, representing the plaintiff, appellee, and cross-appellant. Did you argue the Carnegie Mellon point to the PTO? To the PTO, no, Your Honor. There was no mechanism. Okay. Are you arguing in your brief now that the PTO erred by failing to explain the difference between this case and Carnegie Mellon? That's not really the argument, Your Honor. Carnegie Mellon certainly was front and center when the Cancer Foundation appealed to the district court. But at the PTO, there was no mechanism for even raising the issue of Carnegie Mellon because Carnegie Mellon involved a certificate of correction under Section 255. The PTO's position, as reflected in its manual, the NPEP, Section 1490, is that Section 355 is not available to withdraw or correct an erroneously filed terminal disclaimer. And so what the Cancer Foundation did is it followed the rules at the NPEP, and the NPEP said that the only mechanism for raising the issue was under 37 CFR Section 1.182, and then also the Cancer Foundation also raised Section 1.183. The first opportunity for the Cancer Foundation to raise the issue was at the district court. And the Cancer Foundation sought a certificate of correction from the district court. As this court held in Suffolk Technologies, which is cited in our brief, the issue was properly before this court because the district court recognized, considered, and ruled on the issue. But if the court looks at Section 1490, and actually also the PTO's own final decision, it said the mechanisms to correct a patent, including a certificate of correction, are not available to withdraw or otherwise nullify the effect of a recorded terminal disclaimer. And as this court held in the Georgie Warren case, the foundation was not required to perform useless acts to exhaust administrative remedies. Now what's telling is that Carnegie Mellon was decided under the very same version of Section 255 that is on the books today, and Section 1490 hasn't changed either. And yet the agency has not issued, has not done any informal, formal rulemaking, has not stated to the public that we've changed our view since then. And in Carnegie Mellon, what the attorney filed was something called a petition to expunge if such an animal even exists under the regulations. And yet the PTO issued a certificate of correction. It's also a case in which... You're arguing, as I understand it, that the PTO could not, because this is similar to a settlement, that the PTO could not hold the client responsible for the lawyer's actions, correct? Not under the facts and circumstances of this case. Okay. But this seems to me somewhat different from an ordinary representation situation, and indeed the NPEP distinguishes between the two. This is a situation in which there's an actual declaration by the client appointing the attorney as the attorney of record in the case, right? And that's all there is. But being the attorney of record... But that's a little different from the usual representation situation. In order to make the attorney's disclaimer be effective, the PTO actually has to have a declaration signed by the client saying that the lawyer has authority, right? The lawyer has authority to sign papers on behalf of the client. That doesn't mean that everything that the attorney does has been authorized by the client. No, but the rules specifically say that if there's a declaration appointing somebody as attorney of record, then the lawyer can disclaim, right? Well, the rules don't. That interpretation would read right out of the statute and the regulations, both the Certificate of Correction Procedure under 255 and the regulations, because by definition, any disclaimer or any other part of a patent that the patent owner sought to correct under 255 would have been filed by the attorney of record. The PTO regulations distinguish between two situations, one in which there's a representative who's appearing before the PTO, and that representative cannot, just by virtue of coming in to represent the applicant or the SME, enter into a disclaimer. But the rules provide also that if there's a power of attorney specifically signed by the client and submitted to the PTO appointing the attorney, the attorney of record, then the attorney has the authority to disclaim, right? Not if the attorney has not been authorized by the client to do so. And in Carnegie Mellon... But he's been authorized by the declaration that the client said, here's my attorney of record, this person is authorized. Well, in Carnegie Mellon, the attorney filed the erroneous disclaimer twice and waited more than a year to correct it after it had already been published in the official gazette, and that regulation was no bar to a certificate of correction. Similarly, earlier this year, ironically, about the same time the briefs were being submitted in AMCOR, the PTO held a terminal disclaimer in abeyance pending the final outcome. So this regulation has not been consistently applied by the PTO before. Moreover... Are you making an argument about how they have authority, which the government concedes? So let's put that question to one side. And the question is, did the agency reasonably exercise the authority? Now, it's not very hard to distinguish Carnegie Mellon, which, whatever else you might say about it, did not require, in order to withdraw the disclaimer, an inquiry into the attorney-client relationship. So, you know, obviously I have some questions about whether the agency said that, but it's not hard to see how that's a different situation from this one, so that, I guess, what are you arguing about? Well, it is a different situation, and it's different in ways that don't help the PTO's case, because the only justification that has been served up by the PTO in support of its result is the potential for public reliance. I agree if that were the only justification, that would plainly be insufficient, because it would be inconsistent with Carnegie Mellon. But it's not the only justification. They say, not at much length, but they say, we don't want to get into an inquiry about whether something that on its face was duly filed was intentionally filed. Well, the fact that they don't want to doesn't mean that they don't have to, under various statutes and their own regulations. Why do they have to? Well, they have to because, for one thing, Section 255 authorizes a certificate of correction if something has been filed due to a certain kind of mistake. And then their own regulations, 1.183. But this isn't within 255, right? It is, we contend, and indeed, that's the premise of our cross-appeal, and that was the... Fair enough. Well, then 1.183 is even broader, because 1.183 says that in an extraordinary situation, and I want to make sure I have the language correct here, the PTO's regulations grant it the express authority to waive any requirement of the regulations in this part, which is not a requirement of the statutes. Who gets to determine whether or not it's an extraordinary situation? Pardon me? Who gets to determine whether or not it's an extraordinary situation? Well, that is, Your Honor, is the only fact, probably, or legal conclusion, regardless of how it's characterized, about which everybody vigorously agrees. The Cancer Foundation said it was extraordinary. The District Court, the summary judgment decision said it was an extraordinary situation. And the final decision of the PTO on page 7 also described it as an extraordinary situation. So there's no question that it's an extraordinary situation. Which page is that of the PTO's decisional? I have it cited at page 7. I want to make sure that's correct. What's the record page? I'll get that for you. The regulations say that the PTO has to grant relief to every extraordinary situation. No, Your Honor, of course not. It's extraordinary. And that also gets to the question of the scope of the PTO's rulemaking authority. But wait, why do they have to grant it here? Why do they have to grant relief? Even assuming they have the authority to do it, why must they do it? Because on the record before the agency, it is uncontested that this disclaimer was filed without the authorization. So every time there's a lack of authority, they have to grant it. Well, this is a... No, answer, yes or no. Not necessarily. For example, the concern about public reliance, if that were a valid concern... Put that aside. Why would they have to grant it in every situation where there was no public reliance? In some situations, there might be some dispute as to whether it was authority. Oh, but I'm assuming lack of authority. Let's assume lack of authority. Are you saying that in every single situation where there's lack of authority and there is no public reliance, they must grant the correction? No, we're not saying that, Your Honor. Well, then what are you saying? What we're saying is, first of all, here, the consequences of what was filed are akin to settling a case. Help me. Define for me the circumstances in which you say they must do it. For one thing, the case law says that... No, forget about the case law. What's your position? When must they do it? Define for me the circumstances in which they must do it. They need to do it if there has been a mistake, if it was not authorized, if there's been no public reliance, and if they can't articulate a legitimate justification for not doing it. They have to have a reason, and they haven't articulated any reason other than that they didn't think they had authority,  and they had a reason that it would create an impossible situation in which people could come in constantly after the fact and say, no, no, no, there was no authority here. They say they need to rely on the attorney of record who was specifically authorized by the client. And that's not a reasonable basis under any standard of use of discretion or arbitrary and capricious, because for one thing, here, in such an unusual situation, it's unlikely to ever occur. It's unlikely to provoke a series of copycat efforts to withdraw. Really? How do I know that? The circumstances are unique. The consequences of a withdrawal are severe. Is it possible that there would be a lot of situations where someone would regret filing a disclaimer and come in and say, my lawyer wasn't authorized to do that? That's certainly possible, but that's not this case, and the district court expressly addressed that. This is not a situation where there was a strategic decision to avoid an obvious double-patenting issue or the like, and someone had buyer's or seller's remorse, whatever you want to call it. There was no strategic conduct here, and there's no suggestion of that. I think the basic position, reading into what the PTO said in 899, is that we're not going to do it in this case, because if we do it in this case, we require ourselves in some broader class of cases to make an inquiry that in most cases, filling in, is going to be a nightmare for us, and we're just not going to make the inquiry. Why is that not a perfectly reasonable position in the face of an actual grant of the power of attorney? Because there are 76 regulations of the PTO that require it to examine intent. Those are cited in our brief, and indeed the statute governing terminal disclaimers, Section 253, as in effect at the time, specifically referenced the phrase without deceptive intent. So the PTO may not want to do it, but it has to do it. And what the PTO has done here is it has sought to amend both statutes, 253 and 255, without congressional authority. It sought to amend its own regulations, 1490, which it hasn't followed either, and it has not followed its own precedents, such as Carnegie Mellon, without announcing any change. 1490 is the NPEP, is that what you're saying? It is, yes, Your Honor. That's not regulations, right? Fair enough. Well, it's not a regulation. There is also a regulation, though, 1.183, which refers to extraordinary situations. And to determine whether there's an extraordinary situation, that's obviously a fact-intensive inquiry. They may not want to do a fact-intensive inquiry, but that's what you have to do to determine whether you're going to suspend or waive a requirement of a statute or regulation. They haven't identified any provision of a statute or regulation that the withdrawal or correction would violate in this case. To the contrary, the statute expressly authorizes it. Okay. Thank you, Your Honor. Two quick points, Your Honor. First, the agency explained its decision and its path can reasonably be discerned. They talked about the fact that this was of record. They talked about the fact that a client is normally bound by the actions of his attorney, and particularly his attorney of record. And they said that the PCO is not the proper forum for adjudicating disputes as to exactly what happened between attorney and between client, a proposition that's well-supported in this court's case law. But I think I understood my friend who just said it's essentially an irrational one. Judge Toronto, as to the question whether the agency properly addressed the differences between this scenario and the scenario that came up in Carnegie Mellon, I understand my friend to have just clarified that he did not make that argument either before the agency or in his brief. So now for the first time, we're happy again to say that that argument is waived. But we do think that in that footnote where the agency points out that in that scenario, the inadvertency is clear from the record, that is an entirely rational distinction. And second, if the court does believe that there is something lacking in the agency's decision, obviously the appropriate remedy would simply be to remand to allow the agency to give further explanation in its decision rather than the kind of order that the district court issued here. Unless there are any further questions. Thank you. Thank you. We thank both counsel, the case is submitted. And that concludes our proceedings for this morning.